UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENVILLE

| | | |
|---|---|---|
| CONLEY ROSS FAIR, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Nos. 2:14-CV-340-RLJ |
| | ) | |
| DAVID SEXTON, Warden, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM AND ORDER

Acting pro se, Conley Ross Fair, ("Petitioner"), an inmate at the West Tennessee State Penitentiary, brings this petition for a writ of habeas corpus under 28 U.S.C. § 2254, challenging the legality of his confinement pursuant to a 1997 judgment issued by the Unicoi County Criminal Court [Doc. 1]. Warden David A. Sexton ("Respondent") has submitted an answer to the petition, which is supported by copies of the state court record [Docs. 12-14]. Petitioner has replied to the Respondent's answer [Doc. 16].

The case is now ripe for disposition.

### I. PROCEDURAL HISTORY

In 1997, after a jury trial, Petitioner was convicted of one count of first degree murder and one count of attempted first degree murder. Petitioner was sentenced to a term of life imprisonment plus thirty-five years for these crimes. The judgment was affirmed on direct appeal by the Tennessee Court of Criminal Appeals ("TCCA"). The Tennessee Supreme Court ("TSC") denied permission for further appeal. *State v. Fair*, No. 03C01-9810-CR-00362, 1999 WL 1045074, at *1 (Tenn. Crim. App. Nov. 19, 1999), *perm. app. denied*, (Tenn. 2010).

In September of 2011, Petitioner filed a petition for post-conviction relief with the Unicoi County Criminal Court, which was denied. The TCCA affirmed the state court's denial in 2014. *Fair v. State*, No. E2014-00406-CCA-R3PC, 2014 WL 5502574, at *5 (Tenn. Crim. App. Oct. 31, 2014). Petitioner did not appeal to the ("TSC") Tennessee Supreme Court.

Petitioner then brought this timely habeas corpus application in this Court [Doc. 1].

## II. BACKGROUND

The facts surrounding Petitioner's convictions were recited by the TCCA in its opinion on direct review.

> The defendant was convicted of the first degree murder of Bruce Stukey and the attempted first degree murder of James Brown. By the time of trial, Mr. Brown had died of causes not related to this case. However, the jury heard an audiotape of his testimony from the defendant's preliminary hearing, and a transcript was admitted into evidence. At the preliminary hearing, Mr. Brown testified that around 6:30 p.m. on August 14, he drove Mr. Stukey to the defendant's house. He said Mr. Stukey wanted to buy a gun from the defendant, but the defendant said the gun was hidden on Fire Tower Road. He said the defendant stated that Mr. Brown's car could not make the drive and asked Mr. Stukey to come back in an hour, and the two would go to Fire Tower Road to get the gun. Mr. Brown testified that Mr. Stukey did not want to wait an hour, and they drove to Mr. Stukey's house to get Mr. Stukey's truck. He said they then picked up the defendant, and the three of them went to Fire Tower Road around 7:30 p.m.
>
> Mr. Brown testified that Mr. Stukey had no gun or other weapon and that he would have been able to tell if Mr. Stukey had a weapon underneath his clothing. He said the defendant directed Mr. Stukey to Fire Tower Road and had Mr. Stukey pull off the main road near a trail. He said they all got out of the truck and started walking down the trail. He said the defendant led the way, followed by Mr. Stukey, then himself. He said they walked through heavy woods, then veered off the trail on to a walking path. He stated that the path had lots of stickers and brush and that he stopped and told the defendant and Mr. Stukey that he would wait for them because the area was too wooded. He testified that the defendant told him to continue because they were already there.
>
> Mr. Brown testified that he was about twenty feet from the defendant and Mr. Stukey and that as he tried to make his way down the trail toward them, he heard a loud popping noise. He said he looked up and saw the defendant coming toward him pointing a gun toward his head. He said the defendant shot the gun in his direction, then turned and shot Mr. Stukey twice in the back. He said Mr. Stukey

2

had no weapons and had not threatened the defendant. He said Mr. Stukey fell face down, and the defendant came toward Mr. Brown again. Mr. Brown testified that the defendant looked like he had snapped, and he said he started running through the woods, away from the defendant. He said the defendant chased him through the woods and fired four or five more shots at him. He said the defendant stated, "Come here, boy."

Mr. Brown testified that he continued running but that the incline of the mountain was so steep, he fell and slid down part of the mountain. He said he ran for a long time until he no longer heard the defendant chasing him. He said he continued walking and running through the woods but that he had hurt his leg, and it was getting dark. He said that when it became too dark to continue, he sat down and waited for morning. He testified that when it became light again, he continued walking through the woods until he found a trail that led him to a house. He said he found a man who drove him to a convenience store where he called the police. He said that a bullet had grazed his finger.

Mr. Brown testified that all three men had smoked marijuana on the way to Fire Tower Road. He said that several weeks before the shooting, Mr. Stukey had suspected the defendant of stealing money from him. Mr. Brown stated that he had been in a detoxification program for heroin three weeks before the shooting.
Troy Lewis, an officer with the Unicoi County Sheriff's Department, testified that on August 15, 1995, he was dispatched to Jerry's Market. He said that when he arrived, medical personnel were treating Mr. Brown. Officer Lewis stated that Mr. Brown had numerous scratches and a burn on his right middle finger. He said he learned that Mr. Stukey had been shot on Fire Tower Road and that Mr. Brown had spent the night getting out of the woods. Officer Lewis testified that he and Sergeant Harris went to Fire Tower Road on Buffalo Mountain and searched the area. He said they found Mr. Stukey's red truck, and they secured the scene for the Tennessee Bureau of Investigation (TBI).

Ron Arnold, a criminal investigator with the Unicoi County Sheriff's Department, testified that he was dispatched to Buffalo Mountain around 7:30 a.m. on August 15. He said that fifteen to twenty people were searching for Mr. Stukey's body, but they could not find it. He said they learned that Mr. Stukey was wearing a pager, and they decided to call it. He said they located the pager but not Mr. Stukey's body. He testified that he found a trail consisting of Mr. Brown's receipts, cigarettes, and car keys that led to a blood-stained area deep in the woods. Agent Arnold testified that he determined that this was the location of the shooting. He said he assembled a search party to search the immediate area, and Mr. Stukey's body was found about thirty minutes later, about one-quarter to one-half mile from the crime scene. He testified that the body had numerous scratches. Agent Arnold testified that the next day, he returned to the crime scene with a metal detector and found a spent bullet on the ground.

3

Agent Arnold testified that he learned that the defendant had gone to his sister's house in Dothan, Alabama, but was on his way back to Tennessee. He said that on August 17, he learned that the Johnson City Police Department had the defendant in custody. He said he went to Johnson City to bring the defendant to Unicoi County. Agent Arnold said the defendant was then arraigned and booked and that during the booking process, the defendant removed a piece of paper from his pocket and began to tear it up. Agent Arnold said that another Agent got the letter from the defendant, and they pieced it together. He said the letter was written and signed by the defendant. The letter was admitted into evidence, and in the letter, the defendant admitted killing Mr. Stukey and trying to kill Mr. Brown. He claimed that Mr. Stukey and Mr. Brown took him into the woods to show him a pot plant. He wrote that Mr. Brown struck him from behind, causing him to fall into Mr. Stukey and knock a gun out of Mr. Stukey's pants. The defendant wrote that he fired the gun because he feared for his life.

Agent Arnold testified that after reading the letter, they took the defendant to the emergency room to have him examined. Agent Arnold said he did not notice any injuries on the defendant nor did the defendant complain of any. He said the defendant was not treated for any injuries at the hospital. Agent Arnold testified that after interviewing the defendant's family, he went to 700 E. Maple Street in Johnson City where the defendant had been living with family members. He said he and other officers looked for a gun in the wooded area behind the street. He said they found a gun containing one bullet and a box of ammunition between 632 and 634 E. Maple Street.

Agent Arnold testified that he processed Mr. Stukey's truck for fingerprints but that none were identifiable. He said he found a marijuana pipe containing what appeared to be marijuana residue in Mr. Stukey's truck. He testified that when Mr. Stukey's body was found, it was clothed in a tank top and cotton sweat pants with an elastic stretch band. He admitted that the defendant voluntarily went to the authorities in Johnson City.

Dr. Cleland Blake, the Assistant State Chief Medical Examiner, testified that he performed an autopsy on Mr. Stukey's body on August 16. He testified that the victim died from three gunshot wounds and that he retrieved two bullets from the victim's body. He said one bullet penetrated the front of the victim's left chest, traveling in a downward trajectory and lodging above the rib bone. He said another bullet entered the back through the lower chest area, lodging in a vertebra. He said he found a third wound that entered the back and exited in the front, just under the collarbone. He said this wound caused bleeding in the left chest cavity and penetrated the top of the lung. Dr. Blake testified that the victim lived for as much as one hour after his injuries were inflicted. He said the victim had numerous scratches and bruises. He testified that the first two wounds received were those to the back of Mr. Stukey, with the final wound inflicted at the front of the chest as Mr. Stukey was falling. He testified that the shots were fired from at least three feet away and from a steep angle.

Robert Royse, a firearms identification specialist with the TBI, testified that he examined the revolver found in the bushes, the ammunition in the adjacent box, and the bullets that were retrieved from Mr. Stukey's body and from the crime scene. He testified that the bullets from Mr. Stukey's body were fired from the revolver and were the same as the bullet found at the scene. He said the bullets in the ammunition box were also consistent with the bullets from Mr. Stukey's body and the scene.

TBI Agent Shannon Morton testified regarding the extensive search for the defendant's body. He testified that the search was treacherous because of the wooded, rugged terrain on the mountain and the steep incline. Agent Morton also testified regarding the defendant pulling out a letter and ripping it up during booking. His testimony was substantially the same as that of Agent Arnold. Agent Morton testified that the defendant had no visible injuries and made no complaint of injuries.

Diane Trivette, the defendant's sister, testified that the defendant came to her house in Dothan, Alabama, around 1:00 a.m. on August 15. She said he told her that he thought he had shot and killed someone in self-defense. She told him to turn himself in to the police. She did not see any injuries on the defendant.

Cathy Fair, the defendant's sister-in-law, testified that the defendant lived with her and her husband. She testified that the defendant had stated that he was going to get Mr. Stukey and that she told him to let the law handle the matter. She said she saw the defendant on their porch at around 2:00 a.m. on August 15 and that the defendant said, "I did it." She said she did not know what he meant, and she went inside. She said that when she came outside, the defendant said he had killed the victim. She said she remembered making a statement to Agent Morton relating what the defendant told her about that night. In her statement, she said that the defendant told her that he, Mr. Stukey and Mr. Brown went to the mountain and walked down the trail. She said the defendant told her he asked Mr. Stukey why Mr. Stukey had asked the defendant's niece for "a piece of ass." The defendant told her that Mr. Stukey denied making the statement. She said the defendant told her that he called Mr. Stukey a "lying son-of-a-bitch" and shot him in the middle of the chest. Ms. Fair stated that the defendant told her that Mr. Stukey said he would kill the defendant and that Mr. Stukey came toward the defendant. She said the defendant told her that he then shot Mr. Stukey in the heart and that Mr. Brown ran off. She said the defendant told her that Mr. Stukey was trying to crawl away, and he shot him twice in the back.

Ms. Fair stated that the defendant told her that he went through Mr. Stukey's pockets and took sixty dollars, cigarettes, and a lighter. She said the defendant told her that he talked to Mr. Stukey as he was dying and that Mr. Stukey asked the defendant why he shot him and told the defendant that he loved him. She said

5

the defendant told her that he told Mr. Stukey that "no one f* * *s with my family" and lives.

At trial, Ms. Fair testified that before the defendant left to go with Mr. Stukey on the night of the murder, she knew the defendant was mad at Mr. Stukey for making the sexual comment to her daughter. Ms. Fair testified that the defendant told her that on the mountain, he could not find the keys to Mr. Stukey's truck but that if he had, he planned to take Mr. Stukey to a crack house in Kingsport to make it appear as if he had been killed by drug dealers. She said the defendant told her that he did not chase Mr. Brown down the mountain because he was out of bullets.

Jennifer Gibson, the defendant's niece, testified that on August 11, Mr. Stukey was outside her house in his truck, waiting for the defendant. She said Mr. Stukey asked her "for a piece of ass' and asked her to meet him that night at 8:30. She said the comment scared her because she had been raped twice before, though not by Mr. Stukey. She said she told the defendant about the comment later that day, and the defendant said he would take care of it. She testified that on August 14, the defendant left with Mr. Brown and Mr. Stukey. She said that when the defendant returned, he told her that he had shot Mr. Stukey in the back and killed him because of what Mr. Stukey had said to her.

Eric Alford, a Unicoi County Deputy Sheriff, testified that on August 18, 1997, the defendant initiated a conversation with him following a court hearing. He said the defendant wanted to file a motion to contest the autopsy because the autopsy report was wrong regarding where Mr. Stukey was shot. Deputy Alford testified that the defendant told him that he shot Mr. Stukey "side by side on the shoulder blade" and that he should know because "he shot the motherf* * *er." Deputy Alford said the defendant stated that Mr. Stukey had messed with his niece and that a child molester was the worst kind of criminal. He said the defendant stated that he was raised around violence and that when someone messes with him, his first instinct is to kill them. He said the defendant stated, "if it happened to your niece you'd ... put a bullet in their head."

*Fair*, 1999 WL 1045074, at *1-5. On this evidence, the jury convicted Petitioner of one count of first degree murder and one count of attempted first degree murder.

## III. DISCUSSION

Under the review standards set forth in the Antiterrorism and Effective Death Penalty Act (AEDPA), codified in 28 U.S.C. § 2241, a court considering a habeas claim must defer to any decision by a state court concerning the claim unless the state court's judgment: (1)

"resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d)(1)-(2).

A state court's decision is "contrary to" federal law when it arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or resolves a case differently on a set of facts which cannot be distinguished materially from those upon which the precedent was decided. *Williams v. Taylor*, 529 U.S. 362, 413 (2000). Under the "unreasonable application" prong of § 2254(d)(1), the relevant inquiry is whether the state court decision identifies the legal rule in Supreme Court cases which governs the issue but unreasonably applies the principle to the particular facts of the case. *Id.* at 407. The habeas court is to determine only whether the state court's decision is objectively reasonable, not whether, in the habeas court's view, it is incorrect or wrong. *Id.* at 411.

The AEDPA standard is a high standard to satisfy. *Montgomery v. Bobby*, 654 F.3d 668, 676 (6th Cir. 2011) (noting that "§ 2254(d), as amended by AEDPA, is a purposefully demanding standard . . . 'because it was meant to be'" (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)). AEDPA prevents the use of "federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, 559 U.S. 766, 779 (2010). Furthermore, findings of fact which are sustained by the record are entitled to a presumption of correctness—a presumption which may be rebutted only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Petitioner raises four claims in his petition: (1) multiple theories of ineffective assistance of counsel; (2) denial of the constitutional right of confrontation; (3) unreasonable application of

7

the law by the state court; and (4) insufficient evidence to sustain a conviction of first degree murder and attempted first degree murder [Doc. 1, pp. 11-13].

The Warden argues, in his response, that relief should not be granted because the claims were adjudicated on the merits by the state court, culminating in a decision that cannot be disturbed, given the deferential standards of review set forth in 28 U.S.C. § 2254. The Court agrees with Respondent Warden and, for the reasons which follow, will **DENY** the petition and **DISMISS** this case.

### A. Ineffective Assistance of Counsel

Petitioner asserts three separate theories of ineffective assistance, including allegations that trial counsel failed: (i) to make an offer of proof of prior inconsistent statements made by a key witness; (ii) properly present a self-defense theory; and (iii) to demonstrate to the court that Petitioner "personally waived his right to testify" [Doc. 1 p. 11].

In opposition to Petitioner's claims, Respondent asserts that the state court's adjudication of Claims (i), (ii) and (iii) was not contrary to or an unreasonable application of the relevant Supreme Court precedent in *Strickland* [Doc. 12, pp. 16-22]. Further, Respondent argues that Petitioner has failed to "overcome the presumption of correctness accorded these factual and credibility determinations." [*Id*.].

To prevail on a claim of ineffective assistance, a petitioner must show that a deficient performance on the part of counsel resulted in prejudice to his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The appropriate measure of attorney performance is "reasonableness under prevailing professional norms." *Id*. at 688. Petitioner must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id*. at 690. The evaluation of the objective reasonableness of

8

counsel's performance must be made "from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). Thus, it is strongly presumed that counsel's conduct was within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689.

When considering prejudice, a petitioner must show a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. A reasonable probability "requires a substantial, not just conceivable, likelihood of a different result." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (citation and internal quotation marks omitted).

Finally, petitioners who assert claims of "ineffective assistance of counsel under *Strickland* have a heavy burden of proof." *Whiting v. Burt*, 395 F.3d 602, 617 (6th Cir. 2005). "[W]hen a federal court reviews an ineffective-assistance claim brought by a state prisoner, the question is not simply whether counsel's actions were reasonable, 'but whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.'" *McGowan v. Burt*, 788 F.3d 510, 515 (6th Cir. 2015) (quoting *Harrington v. Richter*, 562 U.S. 86, 105 (2011)).

Citing to *Strickland*, the TCCA applied its test to Petitioner's claims of ineffective assistance and required him to show: "(1) that counsel's performance was deficient and (2) the deficient performance prejudiced the defense…" *Fair*, 2014 WL 5502574, at *12. Because the TCCA cited to *Strickland* and employed *Strickand*'s two-pronged test in reviewing

9

Petitioner's claims, its conclusions relative to those claims are not contrary to the well-established legal rule in Supreme Court cases governing ineffective assistance claims.

1. Prior Inconsistent Statements

Applying *Strickland*, the TCCA first addressed Petitioner's claim that counsel failed to make an offer of proof of prior inconsistent statements made by the only eyewitness to the shooting. The TCCA held that while counsel "presented no police reports or documentation regarding the relevant statements . . . the post-conviction court properly found that overwhelming evidence of the Petitioner's guilt was presented at the trial." *Fair*, 2014 WL 5502574, at *12. The court noted that Petitioner's conviction was based, in large part, on the "testimony of the Petitioner's niece and sister-in-law, who testified that the Petitioner admitted killing Mr. Stukey and shooting at Mr. Brown after confronting Mr. Stukey about his sexual advances toward the Petitioner's niece." *Id*. ¶

The TCCA found that while counsel's performance may have proven to be deficient, an offer of proof regarding the prior inconsistent statement would not have changed the outcome of the trial or the appeal. *Id*. Finding no reason to disturb the trial court's finding against Petitioner, the TCCA did not grant relief on this claim.

2. Self-Defense

The TCCA next discussed Petitioner's allegations that counsel failed to properly present a self-defense theory. The TCCA held that counsel had been unsuccessful in his attempts to locate potential witnesses to testify on Petitioner's behalf, but that the failed attempts did not amount to deficient performance. The TCCA noted that Petitioner failed to present any potential trial witnesses at his post-conviction hearing and, citing *Black v. State*, 794 S.W.2d 752 (Tenn.Crim.App.1990), held that "when a petitioner claims counsel was ineffective by failing to

10

call a witness at a trial, a petitioner generally cannot establish prejudice without presenting that witness at the post-conviction hearing." The TCCA held, based on Petitioner's failure to present witnesses at his post-conviction hearing and, as a result, his failure to establish prejudice, that Petitioner was not entitled to relief on this basis.

      3. Right to Testify

Finally, the TCCA addressed Petitioner's claim that counsel was deficient for failing to protect Petitioner's right to take the stand when the record contained no indication that Petitioner had explicitly waived his right to testify. The TCCA, in its analysis of Petitioner's claim, ultimately addressed the issue of "whether counsel adequately advised the Petitioner of his right to testify and whether the Petitioner made an informed decision." *Fair*, 2014 WL 5502574, at *13. The TCCA, finding "undisputed evidence . . . that the Petitioner and counsel discussed whether the Petitioner should testify at the trial and that counsel advised the Petitioner against testifying because of his lengthy criminal history," found no deficient performance on counsel's behalf and no prejudice. *Id.*, at *14.

This Court finds that the TCCA did not unreasonable apply *Strickland* in its adjudication with respect to the three alleged attorney errors encompassed in this claim. Further, Petitioner has failed to overcome the presumption of correctness accorded to the TCCA's factual determinations as is required by 28 U.S.C. § 2254(e)(1). The writ of habeas corpus will not issue on Petitioner's ineffective assistance claims.

### B. Denial of the Constitutional Right of Confrontation

Petitioner's second claim alleges a denial of the constitutional right of confrontation as guaranteed to him by the 6th and 14th amendments [Doc. 1 pp. 11-12]. Specifically, Petitioner alleges that the court allowed the state to introduce hearsay—namely, Mr. Brown's preliminary

11

hearing testimony—as substantive evidence, while denying Petitioner an opportunity to present evidence of Mr. Brown's prior inconsistent statements to rebut it [*Id.*]. Petitioner also argues that the court's decision to allow a redacted audio tape and transcripts of Mr. Brown's testimony infringed on Petitioner's right of confrontation "because the redacted portions related directly to the alleged victim's prior criminal history, which would have adversely affected the state's case in chief" [*Id.*].

The Confrontation Clause, found within the Sixth Amendment, guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The right of confrontation "'protects a defendant against a conviction . . . by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit.'" *United States v. Washam*, 468 F. App'x 568, 571 (6th Cir. 2012) (quoting *Perry v. New Hampshire*, 132 S.Ct. 716, 723 (2012)). A petitioner's rights under the Clause include the right to a meaningful cross-examination and the "right to impeach [a witness] with inconsistent statements." *Blackston v. Rapelje*, 780 F.3d 340, 348–49 (6th Cir. 2015). However, "a violation of the Confrontation Clause does not warrant automatic reversal." *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). Rather, the denial is "subject to harmless-error analysis" to determine whether, assuming a cross-examination were fully realized, a reviewing court would "be convinced beyond a reasonable doubt that the jury would have reached the same result . . . if cross-examination had led the jury affirmatively to believe that the witness was lying." *Id.*

### 1. Prior Inconsistent Statements

In revisiting the trial court's decision to reject Petitioner's offer of evidence, both the state and the TCCA agreed that the trial court erred in excluding the evidence of Mr. Brown's

12

prior inconsistent statements. However, the TCCA held that the rejection of the evidence in violation of the Confrontation Clause was harmless because Petitioner "failed to demonstrate either that the proffered statement was inconsistent or that the trial court's ruling affected the outcome of the trial." *Fair*, 1999 WL 1045074, at *6.

The TCCA ruled similarly when addressing the issue again in Petitioner's post-conviction appeal. *Fair*, 2014 WL 5502574, at *11. On appeal, Petitioner contended "that the post-conviction court erred by failing to make findings of fact and conclusions of law regarding [Petitioner's] claim that he was denied his right to confront witnesses." *Id*. The TCCA found that because "neither the Petitioner nor his counsel mentioned confrontation rights at the post-conviction hearing," Petitioner could not demonstrate by clear and convincing evidence that his confrontation rights were violated. *Id*. Further, and with respect to Petitioner's claim of Mr. Brown's prior inconsistent statements, the TCCA explained that "the trial transcript was . . . included in the appellate record, [but] the substance of Mr. Brown's previous police statements [were] not." The transcript, on its own, was insufficient to demonstrate prior inconsistencies or to show that the state court's decision to exclude the testimony affected the outcome of the trial. *Id*.

As the TCCA held, the record fails to establish a violation of Petitioner's right of confrontation, or that any violation changed the outcome of Petitioner's trial. The TCCA's finding was not based on an unreasonable application of the clearly established relevant rules in Supreme Court jurisprudence and Petitioner has failed to present any evidence to overcome the presumption of correctness afforded to the TCCA's determinations. Accordingly, the writ will not issue with respect to this claim.

### 2. Redacted Testimony

Petitioner also argued that his right to confrontation was violated by the court's admission of a redacted version of Mr. Brown's testimony [Doc. 1 p. 12]. The redacted portion is as follows:

DEFENSE ATTORNEY: And, you were aware that Mr. Stookey was on parole?

MR. BROWN: Yes.

DEFENSE ATTORNEY: Do you know why he was on parole?

MR. BROWN: I knew he got in trouble over his wife, he was married at one time before he went to jail and he was wanting to get out of the marriage and evidently she'd had him put in jail and I didn't know if it was for assault of [sic] for what reasons it was.

DEFENSE ATTORNEY: Were you aware that it involved firearms?

MR. BROWN: No.

In reviewing Petitioner's claim, the TCCA considered the omitted portion and concluded that Petitioner failed to show "that the redacted testimony relating to the victim's conviction for assaulting his wife explain[ed] or qualif[ied] the admitted portion of the testimony" and therefore "failed to show that fairness required the admission of the redacted testimony contemporaneously with the admitted testimony" *Fair*, 1999 WL 1045074, at *7.

Tennessee Rule of Evidence 106 provides, "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." Tenn. R. Evid. 106. "[I]ts application is 'restrict[ed] ... by the qualification that the portion sought to be admitted be relevant to the issue, and only those parts which qualify or explain the subject matter of the portion offered by opposing counsel

14

should be admitted.'" *United States v. Dotson*, 715 F.3d 576, 582 (6th Cir. 2013) (*United States v. Gallagher*, 57 Fed.Appx. 622, 628 (6th Cir.2003)).

As the TCCA correctly explained, "although evidence of the victim's previous conviction for assault may have been admissible at some later point in the trial to support the defendant's self-defense claim that the victim was the aggressor," the rule does not require the court to allow a party to introduce evidence during an adverse party's case if the evidence does not in some way explain the subject matter of the evidence offered by the opposing party. The TCCA found that Petitioner failed to demonstrate that the redacted testimony related to the victim's conviction or that it explained or clarified portions of the testimony offered by the state. Consequently, the TCCA concluded Petitioner's claim—that the trial court abused its discretion by admitting only a portion of Mr. Brown's testimony—was without merit.

The TCCA's finding was not based on an unreasonable application of the law. Further, Petitioner has failed to overcome the presumption of correctness afforded the TCCA's findings of fact. A writ will not issue with respect to this claim.

### C. Unreasonable Application of the Law by the State Court

Petitioner's third claim alleges that the state court's finding of harmless error "denied [P]etitioner his right to [c]onfrontation and due process of law" [Doc. 1 p. 12].

Trial court errors in state procedure and/or evidentiary law do not rise to the level of federal constitutional claims warranting relief in a habeas action unless the error renders the proceeding so fundamentally unfair as to deprive the petitioner of due process under the Fourteenth Amendment. *McAdoo v. Elo*, 346 F.3d 159, 165–66 (6th Cir. 2003)(quoting *Estelle v. McGuire,* 502 U.S. 62, 69-70, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991).

15

This claim provides no cognizable basis for habeas corpus relief. 28 U.S.C. § 2254(a) (habeas corpus relief is appropriate only for constitutional violations); see *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (claims which allege a state law error or an incorrect application of state law do not present cognizable issues for federal habeas review); *Pulley v. Harris*, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law.").

Petitioner is therefore not entitled to habeas corpus relief on this issue.

### D. Insufficient Evidence to Sustain a Conviction of First Degree Murder and Attempted First Degree Murder

Petitioner asserts in his final claim that there was insufficient evidence to sustain his conviction of first degree murder and attempted first degree murder [Doc. 1 p. 13]. The main thrust of his challenge to the evidentiary sufficiency of the conviction is that the state did not present sufficient evidence to satisfy the element of premeditation [*Id.*]. Petitioner attempts to bolster his argument of insufficiency by pointing to the state's lack of evidence regarding statements made at the time of the killing, arguing that the state's evidence consists primarily of statements Petitioner made *after* the killing, "which is not sufficient to support the element fo [sic] premeditation" [*Id.*].

The TCCA approached its analysis of the claim by defining .

> Premeditation is a necessary element of first degree murder. *See* Tenn.Code Ann. § 39 13 202(a)(1). A premeditated act is one "done after the exercise of reflection and judgment."
>
> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

16

*State v. Fair*, No. 03C01-9810-CR-00362, 1999 WL 1045074, at *5 (Tenn. Crim. App. Nov. 19, 1999) (quoting Tenn.Code Ann. § 39-13-202(d)).

The TCCA then summarized the evidence used to establish premeditation. The evidence included: (1) testimony from Petitioner's niece that she had informed Petitioner three days before the shootings that Mr. Stukey had propositioned her, and that Petitioner replied, "I'll take care of it;" [proof of intent prior to the killing](2) testimony from James Brown which, in relevant part, described the interaction between the men after being led into the woods—specifically, that Petitioner led Mr. Stukey and Mr. Brown into the woods under the guise of selling Mr. Stukey a gun, that Petitioner urged the two men to continue deeper into the woods even after Mr. Brown expressed a desire to go back and that Petitioner then, without provocation shot Mr. Stukey and then shot at Mr. Brown, who escaped by fleeing into the woods[mental state at the time]; and finally (3) testimony from Cathy Fair that Petitioner told her that he was going to get Mr. Stuckey for what he had done, and that after the murder Petitioner told Ms. Fair that he planned to take Mr. Stukey's body to a crack house to make it appear as if Mr. Stukey had been killed by drug dealers [prior intent]. *Fair*, 1999 WL 1045074, at *5. The TCCA held that there was sufficient evidence to satisfy the premeditation element based on witnesses' testimony at trial. *Id*.

The controlling rule for resolving a claim of insufficient evidence is contained in *Jackson v. Virginia*. See *Gall v. Parker*, 231 F.3d 265, 287-88 (6th Cir. 2000) (commenting that *Jackson* is the governing precedent for claims of insufficient evidence.), *superseded by statute on other grounds as recognized by Parker v. Matthews*, 132 S. Ct. 2148 (2012). In *Jackson*, the Supreme Court held that evidence, when viewed in the light most favorable to the prosecution, is sufficient if any rational trier of fact could have found the essential elements of the crime beyond

17

a reasonable doubt. *Jackson*, 443 U.S. at 319. Resolving conflicts in testimony, weighing the evidence, and drawing reasonable inferences from the facts are all matters which lie within the province of the trier of fact. *Id*. at 319; *Cavazos v. Smith*, 132 S.Ct. 2, 6 (2011) ("[A] reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" (quoting *Jackson*, 443 U.S. at 326)).

A habeas court reviewing an insufficient-evidence claim must apply two levels of deference. *Parker v. Renico*, 506 F.3d 444, 448 (6th Cir. 2007). Under *Jackson*, deference is owed to the fact finder's verdict, "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008) (quoting *Jackson*, 443 2122 U.S. at 324 n.16). Under AEDPA, deference is also owed to the state court's consideration of the trier-of-fact's verdict. *Cavazos*, 132 S.Ct. at 6 (noting the double deference owed "to state court decisions required by § 2254(d)" and "to the state court's already deferential review"). Hence, a petitioner "bears a heavy burden" when insufficiency of the evidence is claimed. *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir. 1986).

Petitioner presented evidence to the jury to show a lack of premeditation – specifically, that Mr. Brown had testified that Petitioner had suddenly "snapped" in the woods. Petitioner also argued that he fired in self-defense and in reaction to being pushed by Mr. Brown. The jury did not accept either argument. Nothing Petitioner has presented to this Court demonstrates that the TCCA unreasonably determined that the evidence presented to the jury was sufficient to sustain his conviction of first degree murder and attempted first degree murder. Indeed, given the double deference owed to the state court's conclusion and given this record and the evidence

18

contained therein, this Court finds that the state court's application of *Jackson* to the facts of Petitioner's case was not unreasonable and that its decision was not based on unreasonable factual determinations.

No writ will issue with respect to this claim.

## IV. CONCLUSION

For the above reasons, this pro se state prisoner's application for a writ of habeas corpus [Doc. 1] will be **DENIED** and this case will be **DISMISSED**.

## V. CERTIFICATE OF APPEALABILITY

Finally, the Court must consider whether to issue a certificate of appealability (COA) which Petitioner has requested [Doc. 16 pp. 22-23]. A petitioner may appeal a final order in a § 2254 case only if he is issued a COA, and a COA will be issued only where the applicant has made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c). A petitioner whose claims have been rejected on a procedural basis must demonstrate that reasonable jurists would debate the correctness of a court's procedural rulings. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Porterfield v. Bell*, 258 F.3d 484, 485-86 (6th Cir. 2001). Where claims have been dismissed on their merits, a petitioner must show that reasonable jurists would find the assessment of the constitutional claims debatable or wrong. *Slack*, 529 U.S. at 484.

After having reviewed the claims and in view of the law upon which is based the dismissal on the merits of the adjudicated claims, reasonable jurors would neither debate the correctness of the Court's procedural rulings nor its assessment of the claims. *Id.* Because reasonable jurists could not disagree with the resolution of these claims and could not conclude that they "are adequate to deserve encouragement proceed further," *Miller-El v. Cockrell*, 537

U.S. 322, 327 (2003), the Court will **DENY** issuance of a COA. 28 U.S.C. § 2253; Fed. R. App. P. 22(b).

    **AN APPROPRIATE JUDGMENT ORDER WILL ENTER**.

  **E N T E R :**

                   s/ Leon Jordan
                   United States District Judge